IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 15, 2017 Session

## STATE OF TENNESSEE v. JOHN DAVID SMARTT

**Appeal from the Circuit Court for Warren County**
**No. F-14190    Larry B. Stanley, Jr., Judge**

_____

### No. M2016-01407-CCA-R3-CD

_____

Defendant, John David Smartt, was indicted for five counts of rape of a child, (Counts 1, 2, 3, 6, and 9); one count of rape, (Count 12); three counts of especially aggravated sexual exploitation of a child, (Counts 4, 7, and 10); and three counts of aggravated sexual exploitation of a child (Counts 5, 8, and 11).  Following a second jury trial, after the first trial ended in a mistrial, Defendant was convicted as charged on all twelve counts.  The trial court imposed an effective sentence of 153 years' incarceration.  In this appeal as of right, Defendant contends that: 1) the trial court erred by allowing testimony regarding a recorded phone call by the victim to Defendant; 2) the trial court erred by allowing into evidence Defendant's wife's journal; 3) the evidence was insufficient to support Defendant's convictions; 4) this court should overturn prior case law, so that the testimony of a victim regarding the content of sexually explicit material must be corroborated; and 5) his sentence is excessive.  Having reviewed the entire record and the arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Joshua T. Crain, Murfreesboro, Tennessee, for the appellant, John David Smartt.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Lisa Zavogiannis, District Attorney General; and Thomas Miner, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Facts*

The victim in this case, whom we will identify by her initials, J.S., was 20 years old at the time of trial. Defendant is her father. She testified that Defendant had not worked since 2001, due to his degenerative disc disease and osteoarthritis. J.S.'s mother "always had a job" and worked as a certified nursing assistant. J.S. testified that her mother typically left the house at 5:30 a.m. to go to work and left work to come home at 4:30 p.m. J.S. testified that her mother also had second and third jobs and worked "late into the night." J.S. and her brothers were left in the care of Defendant.

J.S. testified that on an occasion when she was four years old, she was alone with Defendant in the living room, and Defendant turned on a pornographic movie. She described the movie and testified, "it went to a shot of a woman giving a man a blow job and [Defendant] kind of explained to me, you know, that she was enjoying it, he was enjoying it." She testified that Defendant then took her into his bedroom, and "it was the first time that I remember he told me to give him a blow job and when I wasn't understanding what I was supposed to be doing he just kept saying, suck it like a straw . . . ." J.S. testified that she "couldn't do what he wanted [her] to do and he stopped" and told her not to tell anyone about the incident. She testified that Defendant "put his penis in [her] mouth and wanted [her] to suck on it."

J.S. described another occasion when Defendant showed her a video:

> There was a home video of my mom that he showed to me and told me, you know, that she liked what she was doing and it like started out with her playing with herself with a toy and the camera was up close and you could hear him talking and then later on in the video it backs up and she is on the bed and then he gets onto the bed with her and they have sex and he showed it to me. I only remember seeing it one time but it was when we lived in Morrison.

J.S. testified that she did not remember how old she was at the time of the incident, but she estimated that she was eight or nine years old. She described another incident when Defendant showed her a sexually explicit video:

> On one other occasion that he showed me a video on the computer. It was like of a young girl and a man where she was playing to be a young girl. In the video she was playing like his daughter and he was getting on to her because her room was dirty and told her that he needed to

- 2 -

punish her and like she runs upstairs and then the video starts out with her giving him a blow job and then proceeds to go on and they have sex.

. . . .

She looked young. I mean I guess she was an adult playing like a teenager but she looked young.

J.S. testified that Defendant told her, "that's what happens to bad girls." She testified that Defendant asked her to perform oral sex "basically . . . on a daily basis. It happened so frequently that I knew when he cracked the door open and poked his head in and said, [J.S.], come here, I knew what was going to happen."

She described an incident when she was in kindergarten:

I was in kindergarten. We were living in a house on Bybee Drive here in McMinnville and he brought me into his bedroom, my parents' bedroom, and he had me lay on the bed and try like while I was laying down trying to do it upside down while he would stand up on the side of the bed and try to give him a blow job and he would lean over me and I would be laying down and he had me do that until he ejaculated and when he came on my body he asked me what it felt like and I didn't know. The only thing I associated it with was like ketchup so I told him that it felt like hot ketchup.

J.S. testified that she did not know that Defendant's behavior was wrong at the time. She testified that Defendant told her, "that's what daddies do to show their little girls that they love them . . . so I thought that if I did that that he would be nice to me."

J.S. testified about an incident that occurred in the family's minivan when she was in kindergarten. She testified that Defendant picked her up from school, and stopped the car and "had [her] come up to the front of the van and he pulled out his penis and he told [her] to suck it and [they] sat at the stop sign and [she] gave him a blow job." She testified that "[i]t was the first and only time that that had ever happened."

J.S. also testified about an incident when Defendant took photographs of her. She testified that Defendant picked her up from basketball camp and took her home. She testified,

[H]e brought me to my parents' bedroom and it was just me and him in there. My mom had just gotten him a digital camera that he had been wanting for a long time and he got a white towel and laid it over the foot

of their bed and told me to get undressed except for the shirt and he wanted me to get on my knees so that he could take pictures from the angle looking straight on to my vagina from that angle and he would have me hold my hair up and look up and my face was not in the pictures. He took a bunch of pictures and when he was finished he was like, look, and after I got dressed he showed me – he pulled them up on the screen and showed me the pictures that he had just taken.

J.S. was embarrassed and concerned that Defendant would show the photos to other people. She remembered that the incident occurred when she was in fourth or fifth grade because that's when she attended basketball camp.

J.S. testified that when she was in fifth grade, she was taken out of class one day and asked questions about her family by a lady she did not know. The lady asked J.S. if her father had ever harshly disciplined her, whether she had ever seen her parents or siblings without their clothing, and whether she had ever seen a movie that showed people not wearing clothes. J.S. denied that any of those things had happened. She testified, "I didn't know who she was or why she was asking me those questions and my parents had always said, 'what happens under this roof stays under this roof. . . .'" She testified that Defendant imposed "ridiculously horrible punishments for things that shouldn't have been an issue and so I was afraid of telling . . . ."

Regarding Count 6 of the indictment, J.S. testified that when she was 12 years old, she began menstruating. Defendant told her, "[w]hen you start your period you will be a woman and we can have sex and we can make a baby and he would ask me if I had his baby if he would be the baby's dad or the baby's grandpa . . . ." J.S. testified that shortly after she started having periods,

[Defendant] took me into his room he took off all my clothes and he was wearing his pants but he had pulled his penis out of the zipper hole and he pulled me up to the very edge of the bed and tried to wrap my legs around his waist and was trying to like thrust into me but I kept squeezing my legs so that my body would move as he tried to push forward that I would just slide up the bed. I didn't want that to happen and then he started trying to grab my shoulder and just pushing me into him or himself into me just very rough and like he was rubbing himself up and down my vagina with his penis and trying to spit on it and he was pushing in and he – I could feel that he was like trying to push into my hole and then I hollered out that it had hurt. He told me to go to the bathroom and wash myself out.

- 4 -

Regarding Counts 7 and 8 of the indictment, J.S. testified that Defendant showed her photographs on his digital camera of her mother in their bedroom. J.S. described the photographs Defendant showed her:

> Some of them like he was holding her vagina lips open or had his finger inside of her or she was doing the same thing, holding herself open and like he would – he showed me there was a picture of her vagina and there was like white, creamy stuff and he asked me if I knew what that was and then explained to me that he had made her have an orgasm.

After Defendant showed J.S. the photographs, he told her take off her clothes "and pose the same way that [her mother] had." She testified that Defendant "took the exact same pictures of [her] with the exclusion of [her] finger inside of [her] or his finger inside of [her] vagina and the one where she had cream on her." Defendant then showed J.S. the photographs he took of her. J.S. was around 13 years old at the time of the incident. She testified that, unlike when she was younger, she understood that Defendant's actions were wrong. She testified, "I wanted him to be nice to me. I didn't want him to hurt me."

Regarding Count 9 of the indictment, J.S. testified that her brothers were all spending the night at her grandparents' houses, and she was alone with Defendant. She was nine or ten years old at the time of the incident. She testified,

> It was an awful, awful day because from the moment that I woke up until soon before my mom came home I had to spend the entire day naked. [Defendant] fixed a breakfast for us and he was completely naked wanting us to eat breakfast but I just felt so uncomfortable that I couldn't eat and we were in the dining room and he was telling me how sexy that I was and like he was pulling my leg up on to his side and I remember looking over in the reflection of the fish tank and I could see myself and he was telling me that I'm sexy and I remember just thinking I don't look anything like my mom. I wasn't developed in the same way. I was just a little girl and I was confused really, mainly just confused and disgusted and throughout the day it was just he would – he would put his mouth on my vagina and the very end of the day what finally led him to let me put my clothes back on is he had me give him a blow job and he like ejaculated in my mouth but I wouldn't swallow it and I ran to the bathroom and spit it out and he got mad at me and was telling me that there were thousands of girls in this world that would kill to be in my position and that I should have swallowed it and be grateful for what I had and he let me put my clothes back on and hooked up the Playstation

and just went out in the living room and acted like nothing ever happened when my mom came home.

Referring to Counts 10 and 11 of the indictment, J.S. testified that on one occasion, when she was 11 or 12 years old, Defendant made a video with his cell phone of her performing oral sex on him. She testified,

[H]e pulled out his penis and he told me to suck it and he had his phone out taking a video of it and then afterwards he showed me the video of it and that was the last time I ever saw it and I didn't even see the whole thing. He just showed me a little bit of it.

She testified, "I saw my face and I was sucking his penis."

Referring to Count 12 of the indictment, J.S. testified that when she was a freshman in high school, Defendant again had vaginal intercourse with her:

It was very similar to the first time as far as the place and the side of the bed and exactly what he was doing. He was rubbing his penis up and down my vagina and he was trying to push himself into me really hard and I kept trying to avoid it by stiffening up and moving with him but this time he actually – I felt him push himself inside my vagina and it was horrible and painful and I screamed out that it was painful and [ ] he stopped instantly and was telling me that he was sorry and that he didn't mean to hurt me but he had.

J.S. testified that the first time she told anyone about Defendant's sexual abuse, she was 11 or 12 years old. She told her older brother. She testified, "I told him everything. I mean we sat and talked for a while and he was upset and crying and he told me that – like everything that with what he's been through and what I've been through, we need to tell Mom." J.S. and her brother devised a plan that she would scream and run away from Defendant the next time he attempted to abuse her, and they would call her brother's friend to drive them to their mother's workplace. J.S. testified, "a couple of days later [Defendant] pulled me downstairs and he tried to force my hand down his pants and when I yanked away I yelled no and I ran up as fast as I could. We wedged the door. He didn't chase me . . . but we wedged the door anyway . . . ." She testified that they did not have time to call her brother's friend and drive to her mother's workplace before her mother got off work, "[s]o instead we just took the chair away from the door and waited for my mom to come home."

That evening, J.S.'s brother told their mother that Defendant had been molesting her since she was four years old. J.S. testified that her mother left the room and came back into the room with Defendant. J.S.'s mother told her, "you're going to tell him what you said to me." J.S. confronted Defendant:

> I just looked at him dead in the face and I said, I told Mom what you have been doing to me since I was 4 and he is just like licking his lips and he's like, what are you talking about? And I'm like, you know what I was talking about, what you tried to do to me this afternoon. And my mom started crying and he grabbed her and took her downstairs and they were down there for what seemed like forever.
>
> . . . .
>
> [I]t kind of went on like pretty much all evening and all night it being that way. My mom would ask me a few questions or something would be said and then he would just take her downstairs and we don't know what was said between that time and nothing was ever told to us later what was said but we went to bed that night and I slept with [my older brother] because I was kind of scared. I just told and like all hell broke loose in the house.

J.S. testified that the following morning, Defendant "came in the room where me and [my brother] were on the bed and he like corners us in there and was like, 'look what you've done to our family.'" Defendant told J.S. that she was "tearing [his] marriage apart . . . ."

J.S. testified that after she told her mother about the abuse, her mother began "asking [her] questions all the time" and remembering things that J.S. had told her. J.S. and her mother searched for Defendant's cell phone and "tried to get in the computer but then she told me that he said, sorry and that he is changed and that he will never do it again." J.S.'s mother told her that she "needed to forgive" Defendant. J.S.'s mother asked her occasionally if "it [was] still going on and it was but I told her no because when I told the one person that I truly trusted that I was ready to tell, it was just blamed on me."

J.S. testified about an incident that occurred after she reported the abuse to her mother:

> When I had joined the Raider team I was sore all the time because I was working out a lot and we were in his bedroom on the bed and he told me that he would rub my legs because my muscles were sore and he was

doing that but then he pulled off my clothes and he like put his finger inside of me and started like fingering me and I just grabbed my mom's pillow and put it over my face and just held it there and he was just fingering me and I guess because there was no lubrication and his fingernails were long, when he was done he pulled his hand out and there was blood on his hand and under his fingernail and I kind of got freaked out and he told me that it was because his nails were too long and that he was sorry that he scratched me, he wasn't trying to hurt me and I was mortified and just embarrassed and humiliated and physically hurt so I told him like, leave me alone, I didn't want to do it and that was my last recollection of anything. That was the last time.

J.S. also testified about a physical altercation that occurred with Defendant on February 23, 2013:

He came at me and attacked me, started punching me. He took my head by my neck and banged it into the dryer. He was hitting me and all I was trying to do was get away. So I was pulling on the bathroom door and the corner of the dryer and he was pulling on my body so hard that I was lifting the dryer up off of the floor trying to pull away from him and I'm like, I'm calling the cops on you. He said, the cops won't do nothing [sic]. I am your father. He said, I'm your father, I can do whatever I want.

J.S. left the house and moved in with her brother and his wife. On May 17, 2013, she reported the sexual abuse to her high school resource officer, Deputy Jarvis Johnson. She testified that she wanted to report it sooner, but she was afraid.

J.S.'s mother, Clara Smartt, testified that she married Defendant in 1994. She testified that she worked as a certified nursing assistant. Defendant stopped working in July, 2003, and he stayed home with their children while Ms. Smartt worked. For some time, Ms. Smartt had three jobs and worked long hours. Ms. Smartt acknowledged that Defendant had taken nude photographs of her using a digital camera. She also acknowledged that Defendant made a video recording of her and testified that it "probably" showed her having sexual relations with Defendant. Ms. Smartt acknowledged that the video was the subject of a Department of Children's Services (DCS) investigation in 2013, when DCS interviewed Ms. Smartt.

Ms. Smartt testified that J.S. told her that Defendant had been abusing her when J.S. was 12 years old. Ms. Smartt confronted Defendant and "brought him in the house and [ ] had [J.S. and her brother] tell [Defendant] exactly what they told [her]." When

J.S. made the same accusations to Defendant, Ms. Smartt "started [her] own investigation." She looked for photos of J.S. and did not find any. Ms. Smartt testified that she continued to ask Defendant about the allegations. She testified, "from 2008 until September 2012, I put [Defendant] through living hell, asking repeatedly, looking repeatedly for anything and [Defendant] said, 'would it shut you up? Would you believe me?' I said, 'only if it's the truth.'" Ms. Smartt testified that one of the times she confronted Defendant, he responded, "I'll say I did it if it will shut you up." Ms. Smartt testified,

> The only thing I can say is, because I'll have to tell you it's the only thing I can remember, is he did say no and then he did say, if it will shut you up I will say yes. What order it went into, how it transpired, I can't tell you but I can tell you for a fact he said, if it will shut you up I will say yes and he did say no. What order them answers came in I can't tell you that but I can tell you it was said but what order it went into, I can't tell you.

Ms. Smartt acknowledged that she looked for the photos that J.S. had described. On one occasion, she found lotion and a towel out of place, which was consistent with what J.S. told her about Defendant using lotion to masturbate in front of her. Ms. Smartt acknowledged that she observed J.S.'s injuries following an altercation between J.S. and Defendant on February 24, 2013, but Ms. Smartt was not at home when the altercation occurred. Ms. Smartt tried to get J.S. to return home from her brother's house after the altercation, and J.S. refused. J.S. told Ms. Smartt that if she allowed her to live with her brother and his wife, she would not "bring charges up against [Defendant]."

Ms. Smartt denied that she destroyed any evidence that might have been used against Defendant at trial. She testified that she destroyed "an adult toy of [hers] that was not brought up in any of these allegations or any of these charges against [Defendant]." The State offered Ms. Smartt as a hostile witness and questioned her about a journal entry she wrote on August 1, 2013, which read:

> Yesterday I was thinking about all the blessings the Lord has given me in the days before this adversity began and during. I want to write them down so I don't forget. He had me remove something from my home that would have been very embarrassing to me if the sheriff's department would have found them and they would have had to – they would have had [ ] I not listened to the Lord. Two days before this happened [ ] – he had [Defendant] and I destroy a journal of bad things I had written down about [Defendant].

. . . .

Had it not – had I not done that it would have not been good for [Defendant] or I.

Ms. Smartt testified that Defendant was with her when she burned the journal. Ms. Smartt acknowledged that she wrote another journal entry on January 23, 2014, which read:

I have to go back to June or July of 2007 when [J.S.] first told me about what [Defendant] was doing to her. Shock, hurt, anger, I felt all those things toward [Defendant]. I couldn't believe he would do those things. I believed her then. I believe her now.

. . . .

[Defendant] denied it, of course. He said he took pictures and videos of her naked. So I went looking for them. I believed her but I wanted proof. About two weeks after it came to light I told [J.S.] that I still loved [Defendant]. She said, I know, Mama. I was still looking for proof of what [J.S.] had said even though I believed her. I wanted still ask [sic] [Defendant] and he would still deny any wrongdoing. Now this went on and off until the summer of 2012.

On cross-examination, Ms. Smartt testified that when J.S. told her about the alleged sexual abuse, she "looked in [Defendant's] everything, cellphone, computer, this, that, and the other[,]" and she did not find any evidence that Defendant had abused J.S. She testified that she did not contact the police or take J.S. to a doctor because she "wanted to find proof first."

J.S.'s older half-brother, Jimmy, testified that Defendant was not his biological father, but he was the only father he had ever known. Jimmy agreed that Defendant was a "strict disciplinarian" and that Defendant was physically abusive to him and his siblings. He testified that on one occasion, Defendant "slapped [J.S.] so hard that she peed herself and then she was also in trouble for peeing herself." Jimmy testified that from the time he was in sixth grade, his mother was the primary breadwinner, and Defendant supervised him and his siblings.

Jimmy testified that he and his siblings spent a lot of time in his bedroom and that Defendant frequently called J.S. out of the room. Jimmy described a video of his mother that Defendant showed him:

- 10 -

The video it opens with her sitting up on a bed propped up on pillows on the headboard with her legs open and she is – she's touching herself in the video and then later – not long later in the video she uses a purple sex toy in the video and then after a while of that in the video I do know at that point my father comes into the frame but I never saw anything past that point. He would always stop the video if I was seeing it at that point in the video.

Jimmy testified, "although I felt maybe I had reason to suspect" before then, J.S. told him when she was 12 years old that Defendant had sexually abused her. He testified,

Well, I mean it wouldn't have been outside the realm of possibility, if you know – I mean, if like me and him were alone we would be like watching that video or talking about something like that, it wouldn't be outside the realm of possibility to say that when he was taking her out of the room, being alone with her it would have been something similar.

Jimmy was 17 years old when J.S. told him about the abuse. He testified that they devised a plan in which the next time Defendant attempted to do anything sexual with J.S., Jimmy was going to call a friend, "and me and her and the boys could take off running down the road and then my friend would come in his truck to meet us there and then we would get away that way." Jimmy testified, "[w]e never actually implemented the plan[,]" but he encouraged J.S. to talk to their mother when she got home from work. He testified, "Mom got home and [Defendant] was out in the yard and so I kind of waited a minute trying to give [J.S.] an opportunity to say something to Mom and when she didn't I did." Jimmy told his mother that J.S. needed to tell her something, and "[J.S.] told Mom that she had been sexually abused since she was four by [Defendant]." Jimmy testified that Ms. Smartt went outside and brought Defendant inside and said, "I want you to say right here in front of him what you just said to me." J.S. confronted Defendant, and Defendant "led [Ms. Smartt] downstairs and they started to talk down there for a really undeterminable amount of time on my end, felt like forever. Probably wasn't more than 20 minutes." Jimmy testified,

I mean at that point he would come up – they would come up, [J.S.] would provide more details. They would go downstairs, talk some more, come back up, [J.S.] would provide more details, they would go downstairs and then this continued for a few hours.

Jimmy testified that he graduated in 2009 and moved out of his parents' house shortly after graduating. In February, 2013, J.S. came to his house, and she "was frantic."

He testified that Defendant "had hurt her," and Jimmy's wife took photos of J.S.'s injuries. Jimmy told Ms. Smartt that he "felt it would be best if, although [J.S.] was just 17, if she just lived with [him]." He testified that Ms. Smartt "did not like the idea at all." He testified that J.S. told Ms. Smartt, "if you will just let me live with Jimmy and not go back home, then I won't go to the police." J.S. lived with Jimmy until May, 2013. J.S.'s wife, Heather, convinced J.S. to report the abuse. "[S]he felt like we weren't doing the right thing by making the agreement to not go to the police just solely on the premise that [J.S.] could stay." J.S. reported the abuse to a school resource officer. Jimmy testified, "if it hadn't been for Heather adamantly pushing that we go to the authorit[ies] and that we say something to someone then I doubt we ever would have." Jimmy denied that he encouraged J.S. to report the abuse in order to "get out from under [Defendant's] thumb." He testified, "[i]t wouldn't have been much longer anyway before she would have been out [of Defendant's house]."

On May 17, 2013, Detective Jason Rowland, of the Warren County Sheriff's Department, responded to a call about the allegations from J.S.'s school resource officer. Investigator Rowland spoke to J.S. at the school for "probably 30 minutes or something like that." He also spoke with Jimmy, who was present at the school with J.S. Based on their statements, Investigator Rowland obtained a search warrant for Defendant's home.

Prior to executing the search warrant, Detective Rowland assisted J.S. in placing a phone call to Defendant. A listening device and digital recorder was attached to J.S.'s phone. Detective Rowland was present when J.S. made the call to Defendant, and he heard J.S.'s side of the conversation, which lasted approximately 30 to 35 minutes. Detective Rowland did not hear Defendant's responses to J.S.'s allegations. He attempted to listen to the recording, and only J.S.'s side of the conversation had been recorded.

Detective Rowland executed a search warrant for Defendant's home. During the search, police found a silver digital camera in Defendant's bedroom, but the SD card was missing. Police also seized Defendant's computers and sent them to the Tennessee Bureau of Investigation (TBI) for examination. The hard drive was missing from the computer matching the description of Defendant's computer that J.S. had given Detective Rowland.

After the search of Defendant's home was finished, Defendant was transported to the Warren County Jail, where Detective Rowland advised Defendant of his *Miranda* rights and conducted an interview. Defendant denied knowing the nature of Detective Rowland's investigation. Detective Rowland did not attempt to have J.S. submit to a physical examination because "the abuse had kind of dissipated for some time and plus at

the time – by the time this all got reported and brought to my attention for investigation she was already sexually active with other boyfriends at that point."

Rosemary Smartt, Defendant's mother, testified on behalf of Defendant. Rosemary Smartt lived next door to Defendant and his family. She testified about an incident, "on the Sunday before the police came to their house," when J.S. came to her house after an altercation with Defendant. Resemary Smartt testified that J.S. told her "she wanted to get even . . . . She didn't know how but she was going to think about some way and she wanted to get her brother to help her think of a way to get even." Rosemary Smartt testified that on another occasion, J.S. called her from a babysitting job and made "sexual" allegations against Defendant. Rosemary Smartt testified, "I told her if that is what was going on that we should call the police . . . . She told me no, not to do that, not to let [Defendant] know that she said anything to me and not to treat him any differently." Rosemary Smartt also testified that J.S. "messaged [her] on Facebook" and made "more explicit charges or claims . . . over some weeks."

Defendant did not testify or present any other evidence.

### *Analysis*

*Admissibility of testimony regarding phone call between the victim and Defendant*

Defendant argues that the trial court "erroneously permitted testimony regarding the recorded phone call between [D]efendant and J.S., rendering [D]efendant's trial fundamentally unfair." The State responds that Defendant has waived appellate review of this issue by failing to object to the testimony at trial.

Detective Rowland testified that he assisted J.S. in making a phone call to Defendant. A listening device and a digital recorder were attached to J.S.'s phone, but only J.S.'s side of the conversation was recorded. Detective Rowland was present when J.S. made the phone call and he heard her make allegations against Defendant, but he did not hear Defendant's responses. At trial, Detective Rowland testified:

> Q.    Was – of course, based on your conversation with [J.S.], did she understand that the purpose of that call was to see if she could engage [Defendant] in conversation that he would make any admission to her?
>
> A.    Correct.
>
> Q.    Did she indicate to you during that conversation that he had, in fact, made admissions?

A. That's what she told me.

Defendant argues on appeal that this testimony should have been excluded pursuant to Tennessee Rules of Evidence 1002, 1004, and 403. Rule 1002 states that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required . . . ." Tenn. R. Evid. 1002. The unavailability of a recording does not render testimony about the telephone call inadmissible under the best evidence rule. Even if the best evidence rule is applicable here, the rule is one of preference rather than exclusion. *Iloube v. Cain*, 397 S.W.3d 597, 602 (Tenn. Ct. App. 2012) (internal citations omitted). There is no dispute as to the non-existence of a recording of Defendant's responses to J.S.'s allegations. Defendant acknowledges in his brief that "[t]he phone recording at issue only captured one side of the conversation."

Defendant also argues that the State had a "duty to preserve" the evidence under *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). In *Ferguson*, our supreme court addressed the issue of when a defendant is entitled to relief when the State has lost or destroyed evidence that was alleged to have been exculpatory. *Id*. at 915-916 (citing U.S. Const. amend XIV, § 1 and Tenn. Const. art. I, § 8). The duty to preserve, however, does not extend to that which the State cannot preserve. The uncontroverted evidence in this case establishes that a recording of Defendant's "admissions" during the phone call never existed. Moreover, there is nothing to suggest that a recording of Defendant's side of the conversation, if it existed, would have been exculpatory. The trial court was unable to consider the *Ferguson* factors and make a determination because Defendant failed to object to the evidence.

The State failed to respond to Defendant's arguments regarding the phone call, arguing only that Defendant has waived the issue. Defendant neither filed a motion in limine, nor did he raise an objection at trial to testimony about the recorded phone call. The failure to raise a contemporaneous objection to the admission of evidence at trial typically results in waiver of the issue on appeal. Tenn. R. App. P. 36(a) (noting that relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."); Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence). We conclude that the issue is waived.

*Admissibility of the victim's mother's journal*

Defendant argues that his right against unreasonable searches and seizures was violated when the trial court allowed the State to introduce Clara Smartt's journal into

evidence. The State argues that because Defendant did not have a possessory interest in the journal, he has no standing to challenge the seizure of Ms. Smartt's journal. The State also argues that Jimmy Smartt was not acting as an agent of the State when he discovered Ms. Smartt's journal.

The Fourth Amendment to the United States Constitution and Article 1, section 7 of the Tennessee Constitution guarantee freedom from unreasonable searches and seizures when an individual has a reasonable expectation of privacy in the place searched or the objects seized. A reasonable expectation of privacy is an individual right, and a person must have an interest in the place or items searched in order to have standing to challenge the constitutionality of a search. *State v. Talley*, 307 S.W.3d 723, 730 (Tenn. 2010). Our supreme court has identified several factors for courts to analyze when considering whether a person has standing to challenge a search:

> (1) [whether the defendant owns the property seized]; (2) whether the defendant has a possessory interest in the thing seized; (3) whether the defendant has a possessory interest in the place searched; (4) whether he has the right to exclude others from that place; (5) whether he has exhibited a subjective expectation that the place would remain free from governmental invasion; (6) whether he took normal precautions to maintain his privacy; and (7) whether he was legitimately on the premises.

*Id*. at 731 (quoting *State v. Ross*, 49 S.W.3d 833, 841 (Tenn. 2001) (internal citations omitted)).

Considering the factors above, Defendant did not own the journal seized; he did not have a possessory interest in the journal; he had no possessory interest in the place searched, as Defendant was prohibited from being at the house; he had no right to exclude others from the house; he had no subjective expectation that the place would remain free from governmental intrusion; he had taken no precautions to maintain his privacy at that place; and Defendant was not even on the premises at the time the journal was taken. We conclude that Defendant lacks standing to challenge the journal's entry.

We further conclude that the record supports the trial court's conclusion that Jimmy Smartt was not acting as an agent of the State when he discovered the journal. The trial court allowed defense counsel to voir dire Jimmy Smartt about the journal. In a jury-out hearing, Jimmy Smartt testified he found the journal "between the time that we filed the charges and the time that we went to court but I don't remember exactly when." He testified that he went to his mother's house to pick up his younger brother, and he saw

the journal "sitting under the microwave." He testified, "I picked it up, started reading it, and then I left the house with it." Jimmy testified as follows about finding the journal:

> Q. Okay. Had you ever been asked directly by either Investigator Rowland or anyone else associated with the State's case to see whether or not there was additional information at your mother's house or elsewhere that would benefit this case?
>
> A. I don't think so. I don't – I mean, I don't think so. I mean I know I was asked if I knew of anything that would be at the house.
>
> Q. And who asked you that?
>
> A. I guess – I mean I guess Investigator Rowland might have asked when he was asking me about like, you know, if I knew that tape was still there, did I know if any other things were there or anything like that and I told him I didn't know if anything was there.
>
> Q. And whenever you picked this journal up and you read it, why did you take it?
>
> A. Because there was some stuff in there that, um, that I felt like was in a sense Mom admitting that the things that were said were true in a sense and so I wanted to know if that w[as] something that would help.
>
> Q. Okay. Whenever you read those things and you decided to take it, did you decide to take it for the purpose of assisting either Investigator Rowland or General Miner in their case?
>
> A. I thought it might be a possibility. I didn't know if it would be – I didn't know if it would be worthwhile but I thought I might ask anyway.

After he found the journal, he told the prosecutor about the journal and subsequently gave the journal to the prosecutor. Jimmy testified that he "never looked for anything" at his parents' home. He testified, "I found [the journal] but I didn't look for anything." He testified that he "just grabbed it and just started thumbing through it." On cross-examination, he testified that "[v]ery early on" in the investigation, Investigator Rowland asked him whether there might be anything of evidentiary value at his parents' house, but Jimmy denied that anyone in the prosecution or law enforcement asked him to look for such items.

- 16 -

The trial court denied defense counsel's motion for a mistrial and request for a limiting instruction. The trial court found as follows:

> Based on the time-frame when this happened and the description of the witness about why he was there, where the journal was found, his purpose for leafing through it, it appears that there was no governmental assistance or encouragement to do that. Evidently the only statement that was made by the investigators was two years prior when they asked if there was anything in the house that would sound like would be inculpatory towards the defendant and I certainly – I don't find this to be in any way at the behest of the government or in any way other than happening upon something almost two years later and taking it to the District Attorney to see if it was something they would need.
>
> . . . .
>
> . . . I liken this more to someone happening upon – being in a place where they're allowed to be and happening upon a shell casing a long time after a shooting or something and simply finding something that could be evidence and turning it over to the authorities, having no intent to go and look for it or find it or do any investigation beforehand, just happened upon something where they were and had a right to be.

In *State v. Burroughs*, 926 S.W.2d 243, 246 (Tenn. 1996), our supreme court adopted the "legitimate independent motivation test" for determining whether a private individual acted as an agent of the State. The pivotal inquiries under the "legitimate independent motivation" analysis are: "(1) the government's knowledge and acquiescence; and (2) the intent of the party performing the search." *Id*.

Jimmy Smartt did not go to his mother's house for the purpose of searching for the journal. He testified that he went to the house, with his mother's knowledge and permission, to pick up his younger brother. He saw the journal in plain view in the kitchen. He testified that he was not directed by law enforcement or prosecutors to search for it. After he read the journal, he recognized that his mother was "admitting that the things that were said were true in a sense and so [he] wanted to know if that w[as] something that would help" in the prosecution of the case. He then delivered the journal to the State. Based on this testimony, we conclude that the evidence supports the trial court's conclusion that Jimmy Smartt was not acting as an agent of the State when he discovered the journal. Defendant is not entitled to relief on this issue.

- 17 -

*Sufficiency of the evidence*

Defendant contends that "the evidence is insufficient to sustain any of [his] twelve convictions." When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

Defendant was charged in Counts 1, 2, 3, 6, and 9 with rape of a child. Counts 1 and 2 allege that the offenses occurred on an unknown date between January 1, 1999, and January 1, 2001. Count 3 alleges that the offense occurred on an unknown date between January 1, 1999, and January 1, 2002. Count 6 alleges that the offense occurred on an unknown date between May 1, 2007, and September 1, 2007. Finally, Count 9 alleges that the offense occurred on an unknown date between January 1, 2004, and January 1, 2007. For the offenses committed prior to July 1, 2006, "rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such

- 18 -

victim is less than thirteen (13) years of age." For the offenses committed on or after July 1, 2006, "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a); *see also* Pub. Acts 1992, Ch. 878, § 1. "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7). Accordingly, in order to convict Defendant of child rape, the jury had to find that the State proved beyond a reasonable doubt that the Defendant sexually penetrated the victim and that, at the time, the victim was between the ages of three and thirteen. *See State v. Elkins*, 102 S.W.3d 578, 582 (Tenn. 2003). Count 12 charged Defendant with rape for an offense that occurred when the victim was 14 years old. In order to convict Defendant of rape, the jury had to find that Defendant sexually penetrated the victim, the sexual penetration was accomplished without the consent of the victim, and Defendant knew or had reason to know at the time of the penetration that the victim did not consent. T.C.A. § 39-13-503(a)(2).

At trial, the State presented sufficient proof that the Defendant sexually penetrated the victim. The victim's testimony alone is sufficient to support this conviction. *See State v. Smith*, 42 S.W.3d 101, 106 (Tenn. Crim. App. 2000). The victim testified that Defendant sexually penetrated her on several occasions. She testified about one occasion when she was four years old, and Defendant orally penetrated her; on two occasions when the victim was in Kindergarten, Defendant orally penetrated her; on another occasion when the victim was nine or ten years old, Defendant orally penetrated her; on one occasion when the victim was twelve years old, Defendant vaginally penetrated her; and on an occasion when the victim was a freshman in high school, Defendant orally penetrated her. The victim testified about the incident of rape in Count 12 of the indictment, "it was horrible and painful and [she] screamed out that it was painful[.]"

Defendant essentially challenges the credibility of the victim on appeal, arguing that "the evidence on all counts derived almost exclusively from the testimony of J.S. No material was produced." The uncorroborated testimony of a child victim of sexual abuse is sufficient to support a child rape conviction, and "a jury's verdict will not be overturned unless there are inaccuracies or inconsistencies that 'are so improbable or unsatisfactory as to create reasonable doubt of the [defendant's] guilt.'" *Elkins*, 102 S.W.3d at 582-83 (quoting *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)). Defendant has not pointed out any such inaccuracies or inconsistencies. Moreover, questions regarding the victim's credibility and the weight and value to be given to her testimony are to be determined by the trier of fact and not this court.

Through its finding of guilt, the jury accredited the testimony of the victim, and we will not disturb that finding on appeal. Defendant is not entitled to relief on this issue.

Although Defendant challenges the sufficiency of the evidence as to all of his convictions, arguing that the victim's testimony was insufficient to sustain his convictions, Defendant does not challenge the sufficiency of the evidence as to the specific elements of the offenses regarding his convictions for aggravated sexual exploitation of a minor in Counts 5, 8, and 11, and for especially aggravated sexual exploitation of a minor in Counts 4, 7, and 10. Nevertheless, we conclude that the evidence was sufficient to support those convictions.

In order to establish the offense of aggravated sexual exploitation of a minor, the State was required to prove that Defendant "knowingly . . . possess[ed] with the intent to promote, sell, distribute, transport, purchase or exchange material, that includes a minor engaged in sexual activity[.]" T.C.A. § 39-17-1004(a)(1). "Promote" includes to publish or exhibit the material. T.C.A. § 39-17-1002(6). The offense of especially aggravated sexual exploitation of a minor occurs when a person "knowingly promote[s], employ[s], use[s], assist[s], transport[s], or permit[s] a minor to participate in the performance of, or in the production of, acts or material that includes the minor engaging in sexual activity[.]" T.C.A. § 39-17-1005(a)(1). A defendant may be charged in a separate count for each individual image or video. T.C.A. §39-17-1004(a)(2), -1005(b).

The evidence at trial showed that Defendant made the victim perform sexual acts while he took photos and videos of her. The victim testified about two occasions when Defendant had her pose in specific ways and took photos of her vagina. Defendant showed the photos to the victim. The victim also testified about a video recording that Defendant made of her performing fellatio on Defendant. The victim testified that Defendant showed her the video that showed the victim's face, and she testified, "I was sucking his penis." The victim's testimony alone is sufficient to establish the offense of especially aggravated sexual exploitation of a minor.

Jimmy Smartt testified that Defendant showed him a video of his mother engaged in sexual activity. A rational jury could infer that Defendant possessed photos and video of the victim with the intent to publish or exhibit them. Therefore, the evidence was sufficient to support Defendant's convictions for aggravated sexual exploitation of a minor. Defendant is not entitled to relief on this issue.

*Proof of material in sexual exploitation counts*

Defendant asks this court to overturn its decision in *State v. John Ray Thompson*, Nos. M2003-00487-CCA-R3-CD, M2003-01824-CCA-R3-CD, 2004 WL 2964704

(Tenn. Crim. App., Dec. 20, 2004), *no perm. app. filed*. Defendant argues that a conviction for aggravated sexual exploitation of a minor "based solely upon the testimony of an alleged victim," without the State producing the material that is the basis of the offense is "an unjust result not consistent with other statutes that proscribe producing illegal articles, particularly controlled substances."

In *John Ray Thompson*, the defendant was convicted of seventeen offenses involving sexual contact with three minor girls. In one of the counts, the defendant was charged with aggravated sexual exploitation of a minor, but convicted of the lesser-included offense of attempted aggravated sexual exploitation of a minor. On appeal, the defendant argued that the evidence was insufficient to support his conviction because while the evidence at trial showed that he "may have taken pictures" of the victim, no pictures were found or introduced at trial. The defendant argued that "because there were no pictures, the jury could not determine whether these pictures met the statutory requirements so as to be considered criminal activity." *Id*. at *11. A panel of this court rejected the defendant's argument and held:

> The evidence at trial, viewed in this light, showed that the Defendant woke B.C., who was twelve years old, late one evening, and he asked her if he could take pictures of her. The Defendant directed B.C. to wear a "lingerie outfit," and then he took pictures of her in the outfit. He then asked her to expose her breasts for the pictures, which she did. The Defendant denied that any of these events took place. The jury obviously credited B.C.'s testimony as to whether the Defendant attempted to photograph her, and, therefore, the Defendant was found guilty of attempted aggravated sexual exploitation of a minor. Although the photographs were never found, it is the jury's province to judge the credibility of witnesses, and we do not second-guess the jury on credibility issues.

*Id*.

Defendant analogizes the Tennessee Protection of Children Against Sexual Exploitation Act, T.C.A. § 39-17-1001 through -1008, with statutes proscribing the possession, manufacture, and distribution of controlled substances. He asserts that "a defendant may be convicted of these [sexual exploitation] offenses based upon the testimony of an alleged victim, leading to an unjust result not consistent with other statutes that proscribe producing illegal articles, particularly controlled substances." We are not persuaded by Defendant's argument. Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant contends that his sentence is excessive and the trial court erred by imposing consecutive sentences. Our standard of review of a trial court's sentencing determinations is whether the trial court abused its discretion, and we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*.

At the conclusion of the sentencing hearing, the trial court found that the offenses involved a victim and were committed to gratify Defendant's desire for pleasure or excitement and that Defendant abused a position of trust. *See* T.C.A. § 40-35-114(7) and (14). The trial court also found that the victim was particularly vulnerable due to her age. *See id*. § 40-35-114(4). The trial court noted that the offenses in Counts 1, 2, 3, 4, 5, and 9, were committed prior to the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004). Under the Criminal Sentencing Reform Act of 1989, the presumptive sentence for Class B, C, D, and E felonies was the minimum in the applicable range. The presumptive sentence for Class A felonies was the midpoint in the applicable range. T.C.A. § 40-35-210(c) (Supp. 2001). Thus, the trial court imposed the mid-range sentence of 20 years in Counts 1, 2, 3, and 9 for Defendant's convictions for rape of a child and the minimum sentences of eight years in Count 4 for Defendant's conviction for especially aggravated sexual exploitation of a minor and three years in Count 5 for Defendant's conviction for aggravated sexual exploitation of a minor. Defendant does not offer any argument for the misapplication of enhancement or mitigating factors for those sentences. The trial court imposed the maximum sentence within range for each of Defendant's remaining convictions. The record reflects that the trial court considered all the relevant principles associated with sentencing, including the enhancement and mitigating factors, when imposing the sentences in this case. Accordingly, we conclude that the record fully supports the length of these within-range sentences.

Turning to Defendant's claim regarding consecutive sentencing, our supreme court has held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).

The trial court ordered that Defendant's sentences in Counts 1, 2, 3, 6, 9, and 12 for his convictions for rape of a child and rape, run consecutively. The trial court ordered that Defendant's sentences in Counts 4 and 7 run concurrently with each other but consecutively to Defendant's sentence in Count 10. Defendant's sentences in Counts 5 and 11 were ordered to run concurrently with each other but consecutively to his sentence in Count 8. The trial court also ordered Defendant's sentences in Counts 8, 10, and 11 to run consecutively to his sentences in Counts 1, 2, 3, 6, 9, and 12, resulting in a total effective sentence of 153 years.

The trial court found statutory criteria existed in the record to warrant consecutive sentencing. Specifically, "[t]he defendant [was] convicted of two (2) or more statutory offenses involving sexual abuse of a minor." T.C.A. § 40-35-115(b)(5). Defendant argues that "[t]he trial court effectively imposed a life sentence for a [d]efendant with no criminal record and without adequate consideration for the possibility of his rehabilitation." At the sentencing hearing, the trial court stated the following regarding the nature of Defendant's conduct:

> [T]his is beyond the scope of anything I have witnessed in 20 years. This is as close to pure evil as I have ever seen. This is a person who this woman should have been able to trust. We are born with an innate desire and need to protect our children. The parents are the ones that the child can come to for protection and safety.

We conclude that the record supports the trial court's imposition of consecutive terms. Defendant is not entitled to relief.

CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE